2004-NMCA-045

89 P.3d 88

·STATE of New Mexico, Plaintiff–Appellee,

v.

**Javier HERNANDEZ, Defendant–Appellant.**

No. 23,066.

Court of Appeals of New Mexico.

March 1, 2004.

Certiorari Denied, No. 28,560, March 19, 2004.

Patricia A. Madrid, Attorney General, Patricia Gandert, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Sheila Lewis, Theresa M. Duncan, Assistant Appellate Defenders, Santa Fe, NM, for Appellant.

*OPINION*

FRY, Judge.

{1} Defendant Javier Hernandez appeals his conviction of battery against a police officer on several grounds. He argues that his defense attorney had an actual conflict of interest that impaired his defense in violation of the Sixth Amendment right to counsel. He further contends that the jury instructions contained reversible error. Finally, he argues that the trial court abused its discretion in admitting certain portions of the videotaped arrest underlying his battery conviction. Because we agree with Defendant that the jury instructions were misleading, we reverse and remand.

**BACKGROUND**

{2} The events leading to Defendant's arrest were triggered by a radio dispatch informing police that a person had walked away from the scene of a possible accident or DWI. Soon after the radio dispatch, Officer Stephen Dobbs saw and followed Defendant, who matched the description given in the dispatch. Dobbs got out of his patrol car, turned on his video camera and remote microphone, and approached Defendant where he stood with several other people on a residential porch. Dobbs spoke with Defendant and then asked him to turn around and place his hands on his head. Upon questioning, Defendant admitted that he was carrying a pocketknife. Dobbs then prepared to handcuff Defendant for officer safety reasons. During these events, Defendant held a cigarette in his mouth. As Dobbs stood holding Defendant's hands behind his head in preparation for handcuffing him, Officer Ken Arthur approached the scene and directed Defendant to spit out his cigarette.

{3} The parties disagree about what happened next: Defendant either spit the cigarette directly at Arthur, or he spit it in the general direction of Arthur. Arthur then grabbed Defendant and forcefully put him against the hood of the police car to complete the handcuffing, and a brief struggle ensued. According to both Dobbs and Arthur, Defendant pushed himself off of the car hood and intentionally hit the back of his head against Arthur's face. Other eyewitness testimony indicated that Defendant "bounced" off the hood of the car as a result of the force used by Arthur. One witness testified that during the struggle Arthur may have hit his own head on the open police car door. Arthur testified that Defendant attempted to take his gun. In any event, the struggle concluded when Arthur successfully handcuffed Defendant and placed him in the police car. Although the parties dispute how Arthur became injured, they apparently agree that at some point during the events, Arthur sustained a cut on his head. The altercation resulted in charges of battery against a peace officer and attempted disarming of a peace officer. *See* NMSA 1978, §§ 30–22–24 (1971), 30–22–27(A)(1) (1997).

{4} Defendant's theory at trial was that Arthur used excessive force and that Defendant's actions constituted lawful self-defense in response to that force. Because the defense theory hinged on whether Arthur employed excessive force against Defendant, whether Arthur had used excessive force in the past became a significant issue. During a dispute about the admission of such evidence, it came to light that Defendant's defense counsel had previously represented Arthur in an administrative hearing held to determine whether Arthur would be fired from a different law enforcement position for his involvement in an altercation with school security guards. After this revelation, defense counsel abruptly stopped pursuing the admission of instances of violence by Arthur, presumably to avoid divulging communications protected by the attorney-client privilege.

{5} After a two-day trial, the jury convicted Defendant of battery against a police officer and acquitted him of attempting to disarm a peace officer. Defendant appeals.

## DISCUSSION

### Jury Instruction on Officer Use of Force in an Emergency

{6} The trial court provided the jury with a total of twenty-one instructions. The following instruction, number 16, is the source of the dispute on appeal:

So long as the officer acts in good faith and uses no more force than reasonably necessary to preserve the peace, they [sic] are accorded reasonable latitude in the use of force, because emergencies may arise wherein an officer cannot be expected to exercise the same cool and deliberate judgement of courts and juries in subsequent court proceedings.

As explained below, we conclude that the defects in this instruction constitute reversible error. *State v. Parish*, 118 N.M. 39, 42, 878 P.2d 988, 991 (1994) ("Reversible error arises if . . . a reasonable juror would have been confused or misdirected.").

{7} The primary problem with Instruction 16 is that it presupposes there was an emergency, rather than putting the question of whether there was an emergency before the jury. The State argues that the instruction was a correct statement of the applicable law. While we agree that case law contains the language used in the instruction, we do not agree that case law supports the use of that instruction by itself in this case.

{8} In giving Instruction 16, the trial court relied on language borrowed directly from *State v. Prince*, 1999–NMCA–010, 126 N.M. 547, 972 P.2d 859, a factually similar case that was resolved on different legal grounds. *See id.* ¶ 14 (reversing the defendant's conviction for lack of sufficient evidence). The *Prince* Court had borrowed the language from *State v. Gonzales*, 97 N.M. 607, 610, 642 P.2d 210, 213 (Ct.App.1982). However, *Gonzales* made it clear that "it devolves upon the jury, under the evidence in the case and *proper instructions of the court*, to resolve these questions" of whether a police officer acts in good faith and whether an emergency situation exists to justify an officer's actions. *Id.* at 610, 642 P.2d at 213 (italics omitted and emphasis added).

{9} Accordingly, if an instruction on emergency circumstances was appropriate in the present case, a "proper instruction" would have clearly indicated to the jury that it must weigh the evidence to determine whether an emergency existed. In contrast, Instruction 16 told the jury that an emergency in fact existed, and that the jury should therefore give Arthur leeway in his conduct.

{10} We observe that the language borrowed from *Prince* originated in the context of a civil lawsuit against an officer for excessive force, *Mead v. O'Connor*, 66 N.M. 170, 173, 344 P.2d 478, 480 (1959), which is quoted in *Prince*, 1999–NMCA–010, ¶ 12, 126 N.M. 547, 972 P.2d 859, *Gonzales*, 97 N.M. at 610, 642 P.2d at 213, and *State v. Manus*, 93 N.M. 95, 100, 597 P.2d 280, 285 (1979), *overruled on other grounds by Sells v. State*, 98 N.M. 786, 788, 653 P.2d 162, 164 (1982). When analyzing whether an officer's actions create liability for tort or civil rights claims, the officer's perspective is usually the central focus. *See, e.g., Archuleta v. Lacuesta*, 1999–NMCA–113, ¶ 8, 128 N.M. 13, 988 P.2d 883 (stating that the reasonableness of an officer's use of deadly force is measured "from the perspective of the officer on the scene, with the understanding that officers must often make split-second decisions in difficult situations"); *Baum v. Orosco*, 106 N.M. 265, 271, 742 P.2d 1, 7 (Ct.App.1987) (recognizing the motives of the officer as a critical factor in determining whether a particular instance of excessive force rises to the level of a constitutional violation). Here, in contrast, the issue is whether Defendant acted in self-defense, a question that the jury must analyze through the lens of "a reasonable person in the same circumstances . . . as the defendant." UJI 14–5181 NMRA 2004. To do otherwise would criminalize self-defense any time an officer believes his actions are justified, regardless of whether the officer's actions would put a reasonable citizen in fear of immediate danger of bodily harm. For this reason, we recommend that trial courts exercise caution when borrowing legal propositions pertaining to excessive force in a civil proceeding and importing them wholesale into the context of self-defense in a criminal action.

{11} We recognize that self-defense against a peace officer is sharply limited because officers are permitted to use necessary force to effect an arrest. *State v. Hill,* 2001–NMCA–094, ¶ 8, 131 N.M. 195, 34 P.3d 139; *State v. Kraul,* 90 N.M. 314, 318–19, 563 P.2d 108, 112–13 (Ct.App.1977). In this case, the trial court's other instructions precisely conveyed the limits on self-defense against a peace officer, as directed by the committee commentary to UJI 14–5181. That commentary states that when the victim of the assault is a peace officer, the ordinary self-defense instruction must be modified in keeping with *Kraul.* The trial court followed that directive in Instruction 15, which included the language that "[o]ne does not have the right to self defense when the officer is using necessary force to effect an arrest." This language communicated to the jury the essential legal proposition that citizens must submit to necessary officer force. However, where a jury instruction crosses the line into suggesting that an officer's perception of emergency can eliminate a person's right to defend his bodily integrity, that jury instruction is erroneous. *See Kraul,* 90 N.M. at 318, 563 P.2d at 112 ("The right of self-defense is not barred simply because the other person in the affray is a police officer.").

{12} In conclusion, we reverse Defendant's conviction as a result of the misleading language in Instruction 16. *See State v. Montaño,* 1999–NMCA–023, ¶¶ 16–18, 126 N.M. 609, 973 P.2d 861 (finding error where ambiguous phrasing of jury instruction might have confused the jury about whether it must make the factual determination that a brick wall was a deadly weapon); *State v. Bonham,* 1998–NMCA–178, ¶¶ 25–28, 126 N.M. 382, 970 P.2d 154 (reversing the defendant's conviction of aggravated battery with a deadly weapon where the grammatical structure of the jury instruction improperly informed the jury that a trivet is a deadly weapon), *overruled on other grounds by State v. Traeger,* 2001–NMSC–022, ¶ 1, 130 N.M. 618, 29 P.3d 518.

**Other Issues**

{13} Because we reverse Defendant's conviction on the basis of the jury instruction, we need not address Defendant's arguments regarding defense counsel's apparent conflict of interest and the purportedly erroneous admission of portions of the videotape. However, should the issue somehow arise again on retrial, we observe that events at trial suggest that defense counsel may have had a conflict that undermined Defendant's right to counsel's undivided loyalty. *See State v. Martinez,* 2001–NMCA–059, ¶ 24, 130 N.M. 744, 31 P.3d 1018 (explaining that the Sixth Amendment guarantees the right to counsel's undivided loyalty). In particular, because defense counsel had previously represented Arthur in a matter relating to Arthur's propensity for violence, it appears that counsel did not elicit certain testimony about Arthur's reputation for violence out of concern that he might divulge privileged information obtained during his prior representation of Arthur. *See Church v. Sullivan,* 942 F.2d 1501, 1510–11 (10th Cir.1991) (stating that the defendant had demonstrated an actual conflict of interest where defense counsel had previously represented the prosecution's key witness in a factually related matter); *United States v. Bowie,* 892 F.2d 1494, 1501–02 (10th Cir.1990) (noting the potential for conflicts of interest when defense counsel has previously represented a major prosecution witness in a factually related proceeding). At minimum, these facts would demand an evidentiary proceeding to determine whether a new trial would be required. *Martinez,* 2001–NMCA–059, ¶ 37, 130 N.M. 744, 31 P.3d 1018. Because we reverse on the basis of the erroneous jury instruction, we need not make an ultimate determination on this matter.

**CONCLUSION**

{14} Because of the erroneous jury instruction, we reverse and remand for a new trial.

{15} **IT IS SO ORDERED.**

WE CONCUR: RODERICK T. KENNEDY and MICHAEL E. VIGIL, Judges.