2007-NMCA-037

155 P.3d 775

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Robert W. ELLIS, Defendant–Appellant.**

**No. 26,263.**

Court of Appeals of New Mexico.

Feb. 7, 2007.

Certiorari Granted, No. 30,258, March 26, 2007.

Gary K. King, Attorney General Anita Carlson, Assistant Attorney General, Santa Fe, NM, for Appellee.

Templeman and Crutchfield, Barry C. Crutchfield, Lovington, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} Defendant was convicted of aggravated assault upon a peace officer contrary to NMSA 1978, § 30–22–22 (1971), based on threatening the officer with a tire tool. On appeal, Defendant argues that his conviction should be reversed because the district court failed to properly instruct the jury with regard to his self-defense claim. The State concedes that the district court erred by failing to properly instruct the jury, but argues that the error was harmless because Defendant was not entitled to a self-defense instruction in the first place. We hold that the district court erred in refusing Defendant's tendered jury instruction and conclude that the error was not harmless. We therefore reverse Defendant's conviction for aggravated assault upon a peace officer and remand for a new trial with proper jury instructions.

## BACKGROUND

{2} Defendant was pulled over for a seat-belt violation while test-driving a used pickup

truck with a friend. As Deputy Sheriff Ruben Castro pulled Defendant over, he turned on his in-car camera and microphone and the entire stop was recorded. After stopping Defendant and asking him and his friend for identification and proof of insurance, Deputy Castro informed Defendant that he was issuing a warning for lack of proof of current insurance and a citation for a seatbelt violation.

{3} Defendant contested the citation, arguing that Deputy Castro could not pull him over for a seatbelt violation and stating that he would not sign the ticket. On the videotape, Defendant can be seen moving in and out of the camera's view, alternatively walking toward Deputy Castro and then back to the pickup as Deputy Castro can be heard, loudly and apparently out of control, giving conflicting instructions to Defendant to either "stay over there" or "come here." Defendant eventually walked over to Deputy Castro and took his driver's license from Deputy Castro's clipboard. According to Defendant and his friend, Deputy Castro pulled his gun during this first encounter and pointed it at the ground. Defendant and his friend also testified that Deputy Castro pointed his gun at Defendant as the parties continued to argue. Deputy Castro denied pulling his gun at the initial stop.

{4} After Defendant grabbed his driver's license and Deputy Castro allegedly pointed his gun at Defendant, Defendant got back into the pickup truck and drove to a nearby residence. Defendant explained that he drove away because he was afraid of Deputy Castro and wanted to go some place where there were witnesses. Deputy Castro called for backup and followed Defendant and his friend to a nearby residence where the owner of the pickup truck lived. Defendant waited for Deputy Castro to turn his patrol car around before driving away, and Defendant maintained the speed limit during the entire drive.

{5} After both vehicles arrived at the residence, Deputy Castro pointed his gun at Defendant and ordered him to the ground. Defendant then became angry and moved toward Deputy Castro, stating that he was going to "kick [his] ass" for pulling a gun on

him. Deputy Castro testified that as the Defendant approached him, he put his gun back into his holster and sprayed Defendant with pepper spray twice. At this point, Defendant went back to the pickup truck and pulled a tire tool from the bed of the truck. Defendant then began walking back toward Deputy Castro, who again pulled his gun. Defendant tossed the tire tool back over his shoulder and got back into the pickup truck. Defendant drove closer to the residence. Eventually, additional police officers arrived and after a struggle, both Defendant and his friend were arrested.

{6} Defendant's first trial resulted in a mistrial because the jury was unable to reach a verdict. At both trials, Defendant requested a self-defense instruction. The State did not object to the instruction. The district court found that there was sufficient evidence to support a jury instruction on self-defense. Although the district court accepted Defendant's general self-defense instruction, Defendant argued that if a self-defense instruction is given, a reference to self-defense must also be included in the elements instruction for the charged crime. Defendant then tendered an instruction including such a reference. The district court rejected Defendant's tendered jury instruction, stating that a general self-defense instruction would adequately cover Defendant's self-defense claim. Defendant was convicted of aggravated assault upon a peace officer and sentenced to eighteen months in prison.

## DISCUSSION

{7} On appeal, Defendant argues that although the district court correctly determined that he was entitled to a self-defense instruction, the district court erred in refusing Defendant's tendered jury instruction that included the concept that Defendant "did not act in limited self defense" as one of the elements of the aggravated assault charge. The State concedes that the district court erred, but argues that Defendant's conviction should not be reversed because the error was harmless. Because we are not bound by the State's concession, we will first independently review the district court's decision regarding Defendant's submitted jury instruction. *See State v. Foster*, 1999-

NMSC–007, ¶ 25, 126 N.M. 646, 974 P.2d 140. Second, we will address the State's harmless error argument.

### Jury Instructions on Self-defense

[1–3] {8} "The standard of review we apply to jury instructions depends on whether the issue has been preserved. If the error has been preserved we review the instructions for reversible error. If not, we review for fundamental error." *State v. Benally,* 2001–NMSC–033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (citation omitted). In the present case, because Defendant's argument was preserved, "[w]e review the jury instructions to determine whether a reasonable juror would have been confused or misdirected by the instructions." *State v. Griffin,* 2002–NMCA–051, ¶ 8, 132 N.M. 195, 46 P.3d 102; *see also State v. Parish,* 118 N.M. 39, 41–42, 878 P.2d 988, 990–91 (1994). "[I]f an instruction is facially erroneous it presents an incurable problem and mandates reversal." *Parish,* 118 N.M. at 41, 878 P.2d at 990. Further, "[i]t is reversible error if a reasonable juror might have misunderstood a jury instruction." *Griffin,* 2002–NMCA–051, ¶ 8, 132 N.M. 195, 46 P.3d 102 (internal quotation marks and citation omitted).

[4] {9} The use notes for the jury instructions for self-defense provide that if a self-defense instruction is deemed appropriate, the district court must also include within the essential elements instruction for the charged offense the phrase, "[t]he defendant did not act in self defense." UJI 14–5181 NMRA, Use Note 1; UJI 14–5183 NMRA, Use Note 1. In the present case, Defendant tendered such an instruction, but the district court refused the instruction.

[5] {10} District courts must give uniform jury instructions as written. UJI–Criminal General Use Note NMRA ("[T]he uniform instruction must be used without substantive modification or substitution."); *State v. Armijo,* 1999–NMCA–087, ¶ 24, 127 N.M. 594, 985 P.2d 764. The failure to do so may constitute reversible error. *See Griffin,* 2002–NMCA–051, ¶ 10, 132 N.M. 195, 46 P.3d 102; *see also Parish,* 118 N.M. at 44, 878 P.2d at 993 ("A jury instruction which does not instruct the jury upon all questions of law

essential for a conviction of any crime submitted to the jury is reversible error." (internal quotation marks and citation omitted)). We have previously recognized that the failure to include a reference to self-defense within an elements instruction—where a self-defense argument is supported by the evidence—is an error that may lead to reversal on appeal. *See Griffin,* 2002–NMCA–051, ¶ 20, 132 N.M. 195, 46 P.3d 102 ("The only way to correctly instruct the jury in this case is to comply with the applicable Use Note and include as an essential element the requirement that Defendant did not act in self-defense."); *State v. Foxen,* 2001–NMCA–061, ¶ 10, 130 N.M. 670, 29 P.3d 1071 (holding that the failure to include a reference to self-defense in the elements instruction, as well as the failure to include the appropriate burden of proof in the self-defense instruction, constituted fundamental error); *Armijo,* 1999–NMCA–087, ¶ 12, 127 N.M. 594, 985 P.2d 764 ("Because of the importance of the instructions to the jury concerning the essential elements of a crime, failure to do so can result in fundamental error."). Thus, the district court erred by failing to comply with applicable use notes, which require that the concept of self-defense, when supported by the evidence, be included as an element of the charged crime.

{11} We therefore agree with Defendant's assertion, and the State's concession, that the district court erred by refusing Defendant's tendered jury instruction. We now must address the State's argument that the district court's error was harmless.

### Harmless Error

[6] {12} The State argues that although the district court failed to properly instruct the jury with respect to self-defense, any error was harmless because Defendant was not entitled to a self-defense instruction in the first place. Specifically, the State argues that the evidence presented at trial did not support such an instruction and therefore that Defendant actually received more than he deserved by way of the jury instructions. We disagree.

{13} Initially, we note that there is some disagreement as to whether the district court's error in this case should be subject to harmless error review. We, however, agree with the State's assertion that harmless error review is appropriate in the present case.

{14} "New Mexico appellate courts have acknowledged that most constitutional errors are amenable to harmless error scrutiny." *State v. Benavidez,* 1999–NMCA–053, ¶ 23, 127 N.M. 189, 979 P.2d 234, *vacated on other grounds,* 1999–NMSC–041, 128 N.M. 261, 992 P.2d 274. Such errors include the failure of the district court to instruct the jury on an essential element of the crime charged, *see id.* ¶ 23; *see also Neder v. United States,* 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that "the omission of an element is an error that is subject to harmless-error analysis"), which in the present case would be the absence of self-defense by Defendant. *Griffin,* 2002–NMCA–051, ¶ 20, 132 N.M. 195, 46 P.3d 102. We further observe that while the "[f]ailure to give an instruction which is supported by the evidence is not harmless error," *State v. Diaz,* 121 N.M. 28, 33, 908 P.2d 258, 263 (Ct.App. 1995), to the extent that the evidence presented at trial does not actually support a self-defense instruction, any errors with respect to such an instruction must be deemed harmless. *See Benally,* 2001–NMSC–033, ¶ 46, 131 N.M. 258, 34 P.3d 1134 (Baca, J., dissenting) (stating that where the facts adduced at trial do not support a self-defense instruction, "so far as the jury was instructed at all on that subject, the defendant got more than he was entitled to on the evidence and error, if any, in the instructions so given may not be made the basis of a reversal" (internal quotation marks and citation omitted)); *see also Commw. v. Toon,* 55 Mass.App.Ct. 642, 773 N.E.2d 993, 998 (2002) ("Whether an allegedly erroneous instruction on self-defense (and excessive force in self-defense) is prejudicial (or creates a substantial risk of a miscarriage of justice) necessarily involves examining first whether self-defense was raised sufficiently. If not, the defendant received more than he was entitled to."); *State v. Reid,* 335 N.C. 647, 440 S.E.2d 776, 790 (1994) ("As defendant was not entitled to any jury instructions on self-defense, any mistakes by the trial court in its instructions on self-defense were, at worst, harmless error not necessitating a new trial."). In addition, we have in the past addressed as a threshold issue the matter of a defendant's entitlement to self-defense instructions in the first place. *See Griffin,* 2002–NMCA–051, ¶ 9, 132 N.M. 195, 46 P.3d 102. We therefore agree with the State's contention that harmless error review is appropriate with respect to errors in the failure to give requested jury instructions. However, in the present case, we conclude that the error in the jury instructions was not harmless.

{15} In the context of a claim of self-defense against a police officer, the general self-defense jury instruction must be modified to reflect the understanding that an individual may use self-defense against a police officer only in limited circumstances. *See State v. Hill,* 2001–NMCA–094, ¶ 8, 131 N.M. 195, 34 P.3d 139; *State v. Gonzales,* 97 N.M. 607, 610, 642 P.2d 210, 213 (Ct.App. 1982); *State v. Kraul,* 90 N.M. 314, 318–19, 563 P.2d 108, 112–13 (Ct.App.1977). Specifically, an individual only has a "right to self-defense against a police officer when excessive force is used to effect an arrest." *Hill,* 2001–NMCA–094, ¶ 8, 131 N.M. 195, 34 P.3d 139; *Kraul,* 90 N.M. at 319, 563 P.2d at 113. Thus, in the present case, the jury was instructed in relevant part that

Defendant has the right to self defense against a Peace Officer when the officer uses excessive force to effect an arrest. Excessive force means greater force than reasonably necessary to the performance of the duties of the officer. If an officer uses force reasonably necessary to effect an arrest, there is no right of Defendant to self defense.

The Defendant acted in self defense if:

1. There was an appearance of immediate danger . . . to [D]efendant as the result of Deputy Ruben Castro pointing a pistol at [D]efendant upon traffic stop for failure to use seatbelt[;] and[ ]

2. [D]efendant was in fact put in fear . . . [and] picked up a tire tool because of such fear[;] and[ ]

. . . .

4. The apparent danger would have caused a reasonable person in the same circumstances to act as [D]efendant did.

The State argues that there was simply no evidence, slight or otherwise, to support the elements of Defendant's self-defense claim. To address the State's contentions, we will review the evidence presented at trial in the light most favorable to the giving of the self-defense instruction, *see Hill,* 2001–NMCA–094, ¶ 5, 131 N.M. 195, 34 P.3d 139, being mindful of the fact that a self-defense instruction "should be given if there is any evidence, even slight evidence, to support the claim." *State v. Duarte,* 1996–NMCA–038, ¶ 3, 121 N.M. 553, 915 P.2d 309.

{16} In order for us to conclude that the error in the present case is truly harmless, we "must be able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *State v. Zamora,* 91 N.M. 470, 474, 575 P.2d 1355, 1359 (Ct.App. 1978). Although we appreciate the State's assertion that the evidence in support of Defendant's self-defense claim is somewhat tenuous, we nonetheless conclude that it is sufficient to warrant a self-defense instruction. Therefore, we hold that the district court's failure to properly instruct the jury with regard to self-defense was not harmless error. *See Diaz,* 121 N.M. at 33, 908 P.2d at 263.

{17} At trial, Defendant acknowledged that he had argued with Deputy Castro about the citation and that he had refused to sign the citation. Defendant testified that he walked over to Deputy Castro and took his driver's license from the deputy's clipboard. At that point, according to Defendant, Deputy Castro pulled his gun and pointed it at the ground. Defendant then became concerned and wanted others to witness what was going on, so he told Deputy Castro to call for backup. Defendant testified that Deputy Castro began yelling at him to "come here" and pointed his gun at Defendant as Defendant walked toward him. Defendant further testified that when Deputy Castro pointed the gun at him, Defendant put his arms out to show that he did not have any weapons. Deputy Castro then told Defendant to stand near the rear tire of the pickup truck, at which point Defendant told Deputy Castro that he was going to drive to a nearby residence. Defendant testified that he believed he needed to leave that area because he thought Deputy Castro was going to shoot him. Defendant then testified that when he arrived at the residence, Deputy Castro once again pointed his gun at him. Defendant stated that Deputy Castro sprayed him with pepper spray twice, which scared Defendant, leading him to grab a tire tool from the bed of the pickup truck and approach Deputy Castro. Defendant tossed the tire tool away when he realized that it would not protect him against Deputy Castro. Defendant then played the videotape of the traffic stop at trial and testified as to specific points on the tape that he believed corroborated his version of events.

{18} Similarly, the passenger in the pickup truck testified that Defendant argued with Deputy Castro about the seatbelt citation. The passenger testified that Defendant approached Deputy Castro and retrieved his driver's license from the deputy's clipboard. Deputy Castro then stepped back, unholstered his gun, and pointed it at the ground. Defendant then walked back to the pickup truck. According to the passenger, Deputy Castro asked Defendant to sign the citation and Defendant refused. The passenger then testified that Deputy Castro pointed his gun directly at Defendant. Defendant and the passenger returned to the pickup truck and drove to a nearby residence. The passenger testified that they drove to the residence so that witnesses could observe what was going on. At the residence, Deputy Castro again pointed his gun at Defendant. The passenger testified that Defendant was sprayed twice with pepper spray. According to the passenger, Defendant grabbed a tire tool from the pickup truck, approached Deputy Castro with it, and then tossed the tire tool away. On cross-examination, the passenger also reviewed the videotape of the traffic stop and testified as to specific points on the video that corroborated his and Defendant's version of events.

{19} Additionally, Defendant's ex-girlfriend testified that she was at the residence when Defendant and his friend arrived with

**375**

Deputy Castro following them in his patrol car. She testified that once Defendant stopped the pickup truck, Deputy Castro drew his gun and began ordering Defendant to come toward him. She then testified that Deputy Castro sprayed Defendant with pepper spray twice. Defendant then grabbed a tire tool from the truck and tossed it away as he approached Deputy Castro.

{20} Based on the above evidence, the district court found that a self-defense instruction was appropriate. We agree that the evidence supports Defendant's theory of the case. Defendant argues that Deputy Castro engaged in excessive force by pointing his gun at Defendant during the initial traffic stop. Defendant testified that he was afraid and believed that he was going to be shot. According to Defendant, Deputy Castro's pointing of his gun at the second stop, and his actions in spraying Defendant with pepper spray, continued to frighten Defendant, who in turn grabbed a tire tool to protect himself. Because the evidence above supports Defendant's claim of self-defense, he was entitled to a self-defense instruction.

{21} In contrast to the above testimony, the State argues that the videotape of the traffic stop demonstrates that no rational juror could possibly find that Defendant acted in self-defense. While a review of the videotape lends some credence to the State's version of events, we are unable to conclude that it conclusively disproves the testimony of Defendant, his friend, and his ex-girlfriend. For the majority of the videotape, Deputy Castro is off-camera, and thus it is not readily apparent when Deputy Castro first pointed his gun at Defendant. Moreover, because Deputy Castro was off-camera, a viewer cannot see his body language or use of the gun and pepper spray at the second stop. While the State and Defendant present different interpretations of what happened off-camera, we conclude that, in spite of the videotape, it is possible that a rational juror could accept Defendant's version of events. *See Hill,* 2001–NMCA–094, ¶ 10, 131 N.M. 195, 34 P.3d 139 ("If members of the jury believed Defendant's version of events, it would be reasonable for them to conclude that he acted in self-defense.").

{22} Additionally, the State argues that even if Deputy Castro pointed his gun at Defendant during the initial stop, it was reasonable for him to do so and it cannot be considered excessive force. In support of this argument, the State cites to numerous cases addressing the issue of excessive force by police officers in the context of civil lawsuits. We have previously warned against "borrowing legal propositions pertaining to excessive force in a civil proceeding and importing them wholesale into the context of self-defense in a criminal action." *State v. Hernandez,* 2004–NMCA–045, ¶ 10, 135 N.M. 416, 89 P.3d 88. This is because in civil cases, the central focus of whether an officer used reasonable force is measured "from the perspective of the officer on the scene," *Archuleta v. Lacuesta,* 1999–NMCA–113, ¶ 8, 128 N.M. 13, 988 P.2d 883, whereas the issue of whether a defendant acted in self-defense is a "question that the jury must analyze through the lens of 'a reasonable person in the same circumstances ... as the defendant.'" *Hernandez,* 2004–NMCA–045, ¶ 10, 135 N.M. 416, 89 P.3d 88 (quoting UJI 14–5181 NMRA).

{23} Moreover, the bulk of these cases are federal cases decided under different standards from which we are currently evaluating the evidence. *Compare, e.g., Miller v. Lewis,* 381 F.Supp.2d 773, 780 (N.D.Ill.2005) (granting summary judgment in favor of police officer where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (internal quotation marks and citation omitted)), *with Hill,* 2001–NMCA–094, ¶¶ 5–11, 131 N.M. 195, 34 P.3d 139 (construing the evidence in favor of allowing the requested instruction and concluding that instruction should be given even if only slight evidence supports the claim). We therefore do not find these cases helpful to deciding the case at bar.

{24} The State also cites to two criminal cases that it believes supports its argument that any error in the jury instructions was harmless. We do not find these cases per-

suasive. In *State v. Giminski*, 2001 WI App. 211, ¶ 19, 247 Wis.2d 750, 634 N.W.2d 604, the Wisconsin Court of Appeals upheld a district's court determination that a defendant was not entitled to defense of others instruction. In so holding, the court concluded that the defendant's use of a gun to protect his daughter from a federal agent who was pointing a gun at the daughter's head was not objectively reasonable. *Id.* ¶¶ 17–18. The court based this conclusion in part on the fact that the incident took place in a residential neighborhood in broad daylight, because there was no indication that the agent actually planned to use the gun, and because the defendant knew the agent was entitled to be taking the actions he was taking. *Id.* ¶ 16, 634 N.W.2d 604. The court further held that the federal agent's actions did not constitute excessive force because the agent was in the course of arresting the defendant's daughter, and, based on the law limiting a right of self-defense when an officer is discharging his official duties of arrest, the defendant could not, as a matter of law, have reasonably believed that the officer's conduct amounted to excessive force. *Id.* ¶¶ 18–19. In the case at bar, however, the initial traffic stop took place in an isolated area, Defendant testified that he believed that Deputy Castro was going to shoot someone, and Deputy Castro was not in the course of arresting Defendant when he allegedly pointed the gun at the initial stop. The present case is therefore factually distinguishable from *Giminski*. Moreover, we believe that questions of reasonableness and excessive force, where reasonable minds could differ, are better resolved by a properly instructed jury, rather than an appellate court. *See Griffin*, 2002–NMCA–051, ¶ 9, 132 N.M. 195, 46 P.3d 102; *Foxen*, 2001–NMCA–061, ¶¶ 13–15, 130 N.M. 670, 29 P.3d 1071.

{25} In *State v. Thomas*, 625 S.W.2d 115 (Mo.1981), the Supreme Court of Missouri upheld a defendant's capital murder conviction in the shooting of a police officer. The defendant argued on appeal that he was entitled to a self-defense instruction and that the district court had erred in denying his requested instruction. *Id.* at 122. The court held that the defendant was not entitled to

such an instruction. *Id.* at 123. The defendant had been arrested three times previously by the slain officer and had told others that he was going to get even with the officer. *Id.* at 119. The defendant encountered the officer while driving around looking for one of his dogs and began yelling at the police officer as he drove by him. *Id.* at 120–21. The police officer told the defendant to "come here" and pointed his gun at him. *Id.* at 121. The police officer then told the defendant that he was under arrest. *Id.* At that point, the defendant shot the police officer. *Id.* At trial, the defendant testified that "as he was escaping [the officer] he felt it necessary to kill the officer in order to prevent the officer from killing him." *Id.* at 123. Based on this evidence, the court concluded that the defendant was not entitled to a self-defense instruction because the facts did not "reveal that excessive force was used and that [the] defendant reasonably believed such force was the only means by which he could protect himself against the excessive force." *Id.*

{26} Conversely, in the present case, Defendant was not yet under arrest when Deputy Castro allegedly pointed his gun at Defendant. Moreover, there is no indication in the record that Defendant had any prior encounters with Deputy Castro or that Deputy Castro had any reason to believe that Defendant may be dangerous. Further, Deputy Castro's out-of-control, contradictory instructions to Defendant could reasonably have caused Defendant to believe that he was being set up to be shot for no reason, and Deputy Castro did nothing to calmly explain to Defendant the purpose of signing a traffic citation. Finally, unlike the defendant in *Thomas*, Defendant was not attempting to escape from Deputy Castro when he grabbed the tire tool; rather, Defendant's testimony reveals that he grabbed the tire tool with the hope that it would protect him and cause Deputy Castro to back down. We therefore find this case distinguishable from the case at bar.

{27} As previously mentioned, we believe that, because there was sufficient evidence to support a self-defense instruction, the issue of whether Deputy Castro used excessive

force is best left to a properly instructed jury. *See Hill,* 2001–NMCA–094, ¶ 8, 131 N.M. 195, 34 P.3d 139 ("When there are questions as to whether excessive force has been used by a peace officer, it devolves upon the jury, under the evidence in the case and proper instructions of the court, to resolve these questions." (internal quotation marks and citation omitted)). Thus, to the extent that the State argues that Deputy Castro's actions were reasonable and not excessive, we decline to decide this issue as a matter of law. Moreover, we refuse to adopt the State's contention that a police officer's act of pointing a gun at another individual can never be excessive force. At trial, Defendant presented evidence that Deputy Castro pulled his gun at the initial stop and pointed it at him. Moreover, Defendant testified that, at that point, he was unarmed and had not threatened or otherwise physically harmed the deputy. Defendant further testified that the deputy's actions caused him to be afraid for his life, causing him to drive to an area where there were more witnesses around. Defendant claimed that he grabbed the tire tool only after the Deputy had pointed his gun at him twice and after the Deputy had sprayed him with pepper spray. To the extent that the videotape or the State's arguments on appeal raise questions about this evidence, we conclude that it is best left to the jury to decide.

{28} The State argues that even if Deputy Castro used excessive force, there is no evidence to support the remaining requirements of self-defense. Specifically, the State contends that Defendant cannot assert self-defense because he was the aggressor or instigator of the conflict. Again, we believe that this is a question best left to a properly instructed jury. *See id.* ¶ 10 ("Unless reasonable minds could not differ, the question of whether Defendant was the instigator or the victim should be left to the jury."). Although it is readily apparent from the videotape that Defendant was agitated and upset by the stop, we are unable to conclude as a matter of law that he was the initial aggressor. We note that at the initial stop, Defendant testified that he was not armed and that he did not physically threaten or attack Deputy Castro. Moreover, because Deputy Cas-

tro is not seen on-camera, we cannot say whether he actually pulled his gun at the stop or whether he otherwise acted in a threatening manner toward Defendant. Finally, we observe that Defendant testified that the cause of his anger and agitation was the fact that he was fearful for his life after Deputy Castro pointed a gun at him.

{29} It is for these same reasons that we conclude that Defendant has presented enough evidence to support the remaining elements of his self-defense claim, "particularly in light of the applicable standard, requiring instruction even where the supporting evidence of self-defense is slight." *Foxen,* 2001–NMCA–061, ¶ 13, 130 N.M. 670, 29 P.3d 1071. Although the State raises reasonable arguments concerning the evidence, it is not for this Court to decide which party presents the more accurate version of events. *See State v. Mantelli,* 2002–NMCA–033, ¶ 46, 131 N.M. 692, 42 P.3d 272 (holding that where there were differing views of the evidence, it was necessary to submit an instruction to the jury so the jury could decide the issue); *see also Griffin,* 2002–NMCA–051, ¶ 9, 132 N.M. 195, 46 P.3d 102 (holding that where the evidence supports a self-defense instruction, the jury will determine whether the elements of self-defense are actually met); *Foxen,* 2001–NMCA–061, ¶¶ 13–15, 130 N.M. 670, 29 P.3d 1071 (concluding that if reasonable minds could differ as to the evidence presented, a self-defense instruction is appropriate); *State v. Arias,* 115 N.M. 93, 96, 847 P.2d 327, 330 (Ct.App. 1993) ("[S]ince evidence was presented to create a factual question concerning whether Defendant acted in self-defense, the jury was properly instructed on that defense."), *overruled on other grounds by State v. Abeyta,* 120 N.M. 233, 242, 901 P.2d 164, 173 (1995).

{30} Additionally, we observe that, "[i]n such close circumstances, where the error involves the central issue in the case, it is the better policy to require a new trial under the correct instruction." *Mantelli,* 2002–NMCA–033, ¶ 46, 131 N.M. 692, 42 P.3d 272; *see also Benavidez,* 1999–NMCA–053, ¶ 28, 127 N.M. 189, 979 P.2d 234 (concluding that

to speculate on how a properly instructed jury would have decided the case "would jeopardize Defendant's right to have his conviction rest on an actual finding of guilt, beyond a reasonable doubt, as to each essential element of the crime charged, as our case law requires"). We therefore hold that the district court's failure to properly instruct the jury with respect to self-defense was not harmless error.

**CONCLUSION**

{31} We reverse Defendant's conviction and remand for a new trial.

{32} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge and MICHAEL E. VIGIL, Judge.